UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
SAFIYYAH SALAHUDDIN,

                Plaintiff,                          **MEMORANDUM AND ORDER**

        v.                                         16-CV-1866 (RPK) (PK)

UNITED STATES OF AMERICA,

                Defendant.
-----------------------------------------------------------x
RACHEL P. KOVNER, United States District Judge:

        Plaintiff Safiyyah Salahuddin brings an action against the United States of America ("the government") under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, alleging that a government employee negligently caused a collision between a postal vehicle and her car. *See* Compl. (Dkt. #1). I held a one-day bench trial by videoconference on the issue of the government's liability. After the trial, the parties submitted proposed findings of facts and conclusions of law, as well as briefing on plaintiff's motion to exclude the testimony of defendant's expert witness.

        After considering the evidence introduced at trial, the arguments of counsel, and the controlling law on the issues presented, I set forth below findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. I resolve the outstanding evidentiary issue in defendant's favor and conclude that plaintiff has not met her burden of proof on each element of her negligence claim.

## FINDINGS OF FACT

        The following section constitutes the Court's findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1). These findings of fact are drawn from witness testimony at trial and

1

the parties' trial exhibits. To the extent that any finding of fact reflects a legal conclusion, it shall be deemed a conclusion of law to that extent, and vice versa.

In the early afternoon of May 13, 2014, plaintiff's Nissan Altima collided with a Postal Service Long Life Vehicle ("LLV") operated by United States Postal Service mail carrier Hector Fontanez. *See* Trial Transcript 17:3-10, 40:15-18, 53:10-12, 88:1-10 ("Tr."). The accident occurred in Staten Island at the corner of Lynhurst Avenue ("Lynhurst") and Bay Street ("Bay"). Tr. 55:7-18, 56:3-6. Lynhurst, a one-way street, intersects with Bay, a two-way street, at a ninety-degree angle. Tr. 55:10-18.

Prior to the collision, plaintiff drove down the middle of Lynhurst and stopped in front of a stop sign. Tr. 55:15-16, 56:7-12, 71:12-72:6. A bread truck parked on the left corner of Bay obstructed plaintiff's view of traffic on her left. Tr. 56:13-25, 74:8-75:5. Plaintiff saw the LLV parked on Bay to her right. Tr. 56:13-25. She testified that the LLV also obstructed her view. Tr. 56:13-20, 58:5-9, 75:18-21. A Jeep with a tire mounted on the back was parked about two feet in front of the LLV. Tr. 32:1-3.

Plaintiff pulled up far enough to check for traffic and stopped. Tr. 74:2-75:21. Once plaintiff thought that she could safely turn right onto Bay, plaintiff attempted to make the turn. Tr. 75:6-9. At that point, plaintiff's Altima and the LLV collided, damaging the Altima's front right headlight and bumper and scraping the LLV's left rear bumper. Tr. 29:16-20, 58:5-9; Def.'s Ex. 10; Def.'s Ex. 41. The LLV's front left mirror contacted the Jeep's spare tire, and the LLV stopped with its front right tire on a grassy sidewalk. Tr. 43:20-23, 49:4-15; Def.'s Ex. D-35; Def.'s Ex. D-43. Debris landed on Bay about four inches to the left of the LLV's rear left tire. Tr. 47:2-48:5; Def.'s Ex. D-41. After the accident, plaintiff parked her car on Lynhurst before photographs were taken of the scene. Tr. 84:1-15.

Plaintiff and Fontanez gave conflicting accounts at trial about where the LLV was initially parked and how the accident occurred. I find Fontanez's account to be more credible than plaintiff's.

Fontanez testified that on the day of the accident, he was driving the same mail route that he had covered for a decade. Tr. 19:7-11. As usual, he turned right from Lynhurst onto Bay and parked the LLV. Tr. 39:3-10. To park the LLV, he shifted the vehicle into park, put on the parking brake, turned the wheel to the right, shut off the truck, and took the keys. Tr. 40:17-21. On the day of the accident, he parked the LLV with its back tires four inches from the curb and aligned with a manhole cover located on the sidewalk. Tr. 20:14-21:3, 22:8, 43:17-21. When asked to compare the position of his LLV at the time of the crash with an image of a mail truck with its back end close to the Lynhurst intersection, Fontanez answered that his mail truck was "[a]bsolutely not" parked in the same spot. Tr. 20:13; *see* Pl.'s Ex. 2-2. Fontanez also testified that there were no signs indicating that his parking spot was illegal and that he did not see any white lines painted on the road to delineate a legal parking zone. Tr. 17:11-21, 24:21-25:3.

According to Fontanez, he had turned off his truck and was standing on the truck's ledge reaching over the driver's seat for the mail when plaintiff hit the LLV. Tr. 39:11-40:12. The impact felt to him like an "earthquake." Tr. 29:18-20. Fontanez testified both that he jumped out of the truck at the moment of impact and that the impact's force knocked him out of the truck. Tr. 28:21-23, 29:21-30:13. Fontanez also testified that the impact pushed the LLV two feet into the Jeep and moved the LLV's front right wheel four to six inches over the curb. Tr. 32:20-33:4, 43:20-23, 50:25-51:3.

Two issues that plaintiff identifies in Fontanez's testimony do not discredit his account of the accident. Plaintiff argues that because Fontanez indicated both that he had just parked at the

3

time of the accident and that he had gotten out of and back into the LLV before the accident, his testimony is inconsistent. In the context of the direct examination of Fontanez, that argument falls flat. Plaintiff's counsel asked Fontanez, "once the accident occurred, you immediately got out of your truck, correct?" Tr. 28:21-22. Fontanez replied, "[n]o, I was knocked out of my truck." Tr. 28:23. Then, plaintiff's counsel asked, "once you exited the vehicle, what was the first thing you did?" Tr. 28:24-25. Fontanez asked in return, "[b]efore or after the accident?" Tr. 29:1. Given that Fontanez also testified that he had parked the LLV "maybe ten seconds" before the accident, plaintiff contends that this exchange proves that Fontanez's story is false, and that he was backing his truck up rather than parked when the vehicles collided. Tr. 39:13-15; Pl.'s Proposed Findings of Fact and Conclusions of Law ¶ 23 (Dkt. #43) ("Pl.'s Proposed Findings"). But plaintiff's question about whether Fontanez "exited the vehicle" was confusing—if not a non-sequitur—as a follow-up to Fontanez's statement that he was "knocked out of" the LLV. Fontanez should not be faulted for attempting to clarify a vague question.

In addition, plaintiff argues that Fontanez's assertion that he jumped out of the truck was implausible since he did not anticipate the impact and compared its force to an earthquake. Pl.'s Proposed Findings ¶¶ 24-27. It seems entirely possible that a person could propel himself out of a vehicle that had just been struck. Of greater concern is Fontanez's inconsistent testimony that he was both knocked and jumped out of the truck. See Tr. 28:21-23, 29:21-30:13. That inconsistency might speak to Fontanez's limitations in recollecting how his body moved during the accident, or it might indicate mere ambiguity in his answers. However, even if that inconsistency raises doubts about whether Fontanez jumped or fell, it does not undercut his testimony about how the accident occurred.

Plaintiff's alternative account of the LLV's parking spot and the accident is not credible.

4

With respect to the LLV's initial location, Plaintiff testified at trial that before she turned onto Bay, the LLV was parked with "the back of the truck . . . protrud[ing] onto Lynhurst." Tr. 62:9-10; 78:22-23.  But on cross-examination, plaintiff was confronted with her deposition testimony that the LLV's back end was on Bay.  Tr. 78:24-83:18.  In light of plaintiff's prior statements, I do not credit her trial testimony about the location of the LLV.

Plaintiff's testimony about how the accident happened is incredible.  According to plaintiff's version of events, "as [she] made the right, looking right, the [LLV] backed into [her] and hit [her]."  Tr. 75:8-9; *see* Tr. 58:8-10.  The impact occurred as she was "just starting to turn the wheel."  Tr. 77:5.  Then, plaintiff's car came to a stop, the LLV pulled forward and hit the Jeep, and Fontanez jumped out of the LLV.  Tr. 58:13-18; 77:21-25.

Plaintiff's narrative is not consistent with her deposition testimony or the evidence.  While plaintiff testified at trial that the LLV "backed into" and "hit" her, on cross-examination, she admitted that she had testified at her deposition that the LLV was "probably barely moving" at the time of the collision.  Tr. 75:8-9; Tr. 84:22-86:2.  Moreover, plaintiff variously testified that she did not know whether debris fell off her car, that there was no debris in the street, and that she did not see any debris.  Tr. 91:9-92:11.  Photographs of the Altima's front right bumper and headlight reveal missing pieces, and photographs of the scene show corresponding debris scattered by the back left tire of LLV.  *See* Def.'s Ex. D-2; Def.'s Ex. D-5; Def.'s Ex. D-39, Def.'s Ex. D-40, Def.'s Ex. D-41, Def.'s Ex. D-42.  Common sense dictates that if the LLV had backed into plaintiff and then driven forward, as plaintiff claims, the debris would have been found much farther behind the LLV.  And even if plaintiff had "positioned her vehicle rightward" during the turn, it is difficult to conceive of how the LLV, if parked in the Lynhurst intersection as plaintiff claims, could have backed into her and only contacted the front right

5

corner of her car. *See* Def.'s Ex. D-1; Def.'s Ex. D-2; Def.'s Ex. D-3; D-5; Def.'s Ex. D-10; Tr. 46:19-47:1, 91:24-92:2; Pl.'s Proposed Findings ¶ 14. Since plaintiff's testimony about the crash is inconsistent, contradicts her deposition testimony, and is at odds with photographs taken of the scene, I do not credit it.

Moreover, the testimony of the government's accident reconstruction expert, Richard Hermance, indicated that Fontanez's account is more consistent with the physical evidence than plaintiff's. As explained below, Hermance's expert testimony is admissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Hermance's scientific explanation for the location of debris at the accident scene corresponds with Fontanez's testimony. To determine the "area of impact" between the Altima and the LLV, Hermance calculated how long it would have taken pieces of the Altima to fall to the ground. Tr. 110:7-13. The Altima's headlight is 2.1 feet above the ground. Tr. 110:7. Given the rate at which falling objects accelerate on Earth, the debris would have fallen for about .3 seconds from the headlight to the ground. Tr. 126:20; *but see* Tr. 110:7-10 (transcribing Hermance's testimony as "one to three seconds"). Based on damage to the vehicles and plaintiff's testimony that her vehicle stopped upon impact, Hermance concluded that the Altima was moving at a speed of about five miles per hour. Tr. 123:25-124:2. Hermance later testified that he would estimate the Altima's speed at "a range of about five to ten" miles per hour. Tr. 139:25-140:5. Accounting for the possibility that the debris "might have flew forward" "three or four feet," as well as the final position of the debris, Hermance concluded that the accident occurred "somewhere in the area of where the rear [of the] LLV" stopped on Bay. Tr. 110:15-19, 126:21-24.

6

Hermance explained that if the LLV had backed into the Altima, as plaintiff claimed, the debris would have been found in the intersection of Lynhurst and Bay rather than by the LLV on Bay.  Tr. 111:2-112:9.  Hermance noted plaintiff's "testimony that she was coming down generally in the middle of the road," "had just barely started to turn," "that the LLV had just barely started to move," and that she had pulled into the intersection far enough to see around the bread truck.  Tr. 111:17-112:25.  Under those conditions, Hermance explained, the LLV would have backed up about ten feet before impacting the Altima and the collision would have happened much closer to the intersection.  Tr. 111:24-112:2, 144:23-145:7.  But no debris was found in that area.  Tr. 144:23-145:7.

On cross-examination, plaintiff's counsel attacked Hermance's assumption that plaintiff was driving in the middle of the road.  Tr. 145:8-146:25.  Yet Hermance based that assumption on plaintiff's own testimony as well as his observations of traffic on Lynhurst and his personal experience driving plaintiff's route.  Tr. 145:12-19.

Even if the Altima turned onto Bay from farther right on Lynhurst than Hermance assumed, I still give Hermance's testimony about the debris pattern considerable weight.  Hermance's basic point is that the laws of physics dictate that the debris landed close to the area of impact.  The debris fell around the LLV's rear bumper.  Given Hermance's testimony that the debris could have traveled three to four feet forward, it was reasonable for Hermance to conclude that the cars impacted each other near the LLV's final position, not closer to the intersection.  Insofar as plaintiff testified at trial that Fontanez backed into her while he protruded into the Lynhurst intersection, it would contradict Hermance's explanation of the science to conclude that the debris flew from the intersection to rest at the LLV's rear bumper.  Indeed, Hermance

7

testified that there was "[n]o physical evidence at all that the LLV was backing up." Tr. 148:12-13.

Hermance also testified that the Altima could have pushed the LLV over the curb. Because Hermance's testimony about his calculations was confusing and inconsistent, I give his conclusions about the force exerted by the Altima on the LLV little weight.

Hermance explained that the "speed change of the occupant compartment" of the LLV, or its "delta-v," would have needed to be two miles an hour to push and rotate the LLV two feet forward with its brakes locked as Fontanez testified. Tr. 33:2-4, 129:19-130:22. To generate that amount of force, the Altima would have needed to be moving at four or five miles per hour at the moment of impact. Tr. 130:3-5. But later, Hermance stated that the delta-v was "two and a half miles an hour." Tr. 137:16-17.

Hermance did not provide a clear statement of how he calculated the delta-v. As Hermance explained, he used "the square root of 30, friction times distance, that gives you a speed change to skid a certain distance; and when you skid that certain distance, if you're skidding from a stopped position, that's your delta-v, and once you have your delta-v and you know the speed, you can use kinetic energy. If both equals one half MV squared, that gives you your total energy, so that's your relationship between delta-v, energy, and speed." Tr. 137:24-138:7. That confusing summary of how Hermance arrived at the delta-v figure does not inspire confidence. And Hermance expressed uncertainty about the values that he plugged into the equation. Hermance stated on cross-examination that the delta-v calculation depends on the weights of the vehicles involved in the crash because "a heavier vehicle will push a lighter vehicle farther." Tr. 133:4-8. He then admitted that he had based his conclusion in the expert report on the assumption that the LLV weighed 2700 pounds, that he revised his calculations at

8

trial based on a more precise figure of 3008 pounds, but that the mail truck could have weighed up to 4450 pounds. Tr. 133:12-134:17. Hermance conceded that the difference between 2700 and 4500 pounds "would be significant." Tr. 134:18-22. After further cross-examination, Hermance revised his estimate for the Altima's speed to "a range of about five to ten" miles per hour. Tr. 140:5; *see* Tr. 124:19-21 (estimating plaintiff's speed at five miles per hour, "at most ten"). He then testified that the angle of impact between the vehicles would alter the amount of force needed to move the LLV, but that he did not know the angle of impact. Tr. 142:15-143:9. Ultimately, he testified that the "numbers will be different across different angles," but regardless, that his efforts yielded a "reasonable range." Tr. 143:7-9.

Although I give Hermance's imprecise testimony about the delta-v little weight, I do credit his expert opinion that an Altima could in theory exert enough force on an LLV to move it two feet forwards and over a curb under the circumstances here. Tr. 141:11-142:5, 143:1-9. As Hermance put it, the accident did not involve "a 30,000-pound box truck" and "a little 1500-pound smart car." Tr. 141:19-21. The LLV and the Altima are "pretty much equally-weighted vehicles," and while a change in vehicle weight "by even a thousand pounds" affects the calculation, the Altima did not need to be "going 20 or 30 miles [per] hour" to push the LLV two feet. Tr. 141:21-25.

Notwithstanding the problems with Hermance's calculation of the delta-v, I find his analysis of the debris pattern convincing. Based on that part of his testimony, I credit his conclusion that plaintiff's Altima hit "the stationary left rear of the . . . LLV." Tr. 106:17-19.

In sum, I credit Fontanez's account of the accident. On May 13, 2014, Fontanez parked the LLV on Bay with the rear tires aligned with a manhole cover on the sidewalk. The LLV did not protrude into the intersection. As Fontanez prepared to take the mail from the LLV, plaintiff

9

pulled her Altima past a bread truck to look for traffic, saw the LLV, turned right, and hit the parked LLV. The force of the impact pushed the LLV into the Jeep and onto the grass.

## CONCLUSIONS OF LAW

After considering the trial testimony and all the evidence, I conclude that plaintiff failed to carry her burden to show by a preponderance of evidence that Fontanez negligently caused the accident.

**I.      Expert Testimony**

During the trial, plaintiff objected to Hermance's expert report and trial testimony under Federal Rule of Evidence 702 and *Daubert*. Tr. 101:17-22, 103:17-105:23, 157:8-158:8 (arguing that "the analysis that . . . Hermance performed is not science, and . . . there's nothing expert about it"). She renewed her objection in a post-trial letter motion. Pl.'s Letter Mot. to Strike Def.'s Expert Opinion (Dkt. #44) ("Pl.'s Letter Mot."). I need not address whether the expert report itself is admissible because neither party sought to introduce the report at trial and the government appears to rely on Hermance's trial testimony alone. *See generally* Tr.; *see also* Pl.'s Letter dated Sept. 17, 2020 (Dkt. #41) (listing the expert report at Pl.'s Ex. 32); Pl.'s Letter Mot. Ex. 1 (Dkt. #44-1) (Hermance's expert report marked Pl.'s Ex. 32). Because I conclude that Hermance is a qualified expert whose trial testimony was reliable and relevant, with the exception of his legal conclusion that the LLV was legally parked, Hermance's expert testimony is admitted except as to that legal conclusion.

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" if four conditions are met: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

10

principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  A party seeking to admit expert testimony under Rule 702 "must establish admissibility by a preponderance of the evidence." *Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd.*, 392 F. Supp. 3d 382, 397 (S.D.N.Y. 2019) (citing *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)).  The Rule 702 standard for the admissibility of expert testimony is "liberal."  *Nimely v. City of New York*, 414 F.3d 381, 395 (2d Cir. 2005).

Under Rule 702, the court must first decide "whether the expert is qualified to testify." *Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 422 (S.D.N.Y. 2009).  That determination is based on "the totality of a witness's background."  *Rosco, Inc. v. Mirror Lite Co.*, 506 F. Supp. 2d 137, 144 (E.D.N.Y. 2007) (citation omitted).

After verifying that the expert is qualified, the court must ensure that the "expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597; *accord United States v. Willis*, --- F. 4th ----, 2021 WL 4260375, at *8 (2d Cir. Sept. 20, 2021).  That "gatekeeping role" requires the court to "consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case."  *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation marks and citation omitted) (quoting Fed. R. Evid. 702); *see Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (holding that courts have the same "gatekeeping" role with respect to "technical" and "other specialized" knowledge).  Factors that bear on reliability include whether a theory or technique "can be (and has been) tested," "whether the theory or technique has been subjected to peer review and publication," the technique's "known or potential rate of error" and the

11

existence of standards controlling the technique's operation, and "general acceptance" of the technique or theory in the relevant scientific community. *Amorgianos*, 303 F.3d at 266 (quoting *Daubert*, 509 U.S. at 593-94).

In short, the court must "undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* at 267. The court's analysis "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions." *Id.* at 266. However, "only serious flaws in reasoning or methodology will warrant exclusion," *In re Fosamax Prods. Liab. Lit.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) (citing *Amorgianos*, 303 F.3d at 267). For example, expert testimony should be excluded as unreliable if the testimony "is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or [is] in essence an apples and oranges comparison." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (internal quotation marks and citation omitted). Other deficiencies in the expert's assumptions go to the testimony's "weight, not . . . admissibility." *Id.* at 214 (citation omitted).

Courts are especially reluctant to exclude expert testimony in a bench trial. When the parties present evidence to a judge, not a jury, "there is no possibility of prejudice, and no need to protect the factfinder from being overawed by 'expert' analysis." *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 502 (S.D.N.Y. 2013) (citation omitted). The court may "take in the evidence freely and separate helpful conclusions from ones that are not grounded in reliable methodology." *Joseph S. v. Hogan*, No. 06-CV-1042 (BMC) (SMG), 2011 WL 2848330, at *3 (E.D.N.Y. July 15, 2011).

12

Except for his legal conclusions about Fontanez's parking spot, Hermance's trial testimony meets the requirements of Rule 702 and *Daubert*.

Plaintiff agrees that under Rule 702, Hermance is qualified as an accident reconstruction expert. *See* Pl.'s Letter Mot. at 2. Hermance has degrees in criminal justice and electrical engineering technology, has taught accident reconstruction at universities, police departments, and government agencies, and published a book on accident reconstruction. *See* Tr. 102:9-103:13.

I also conclude that Hermance's trial testimony is reliable. His testimony is based on sufficient data, *see Amorgianos*, 303 F.3d at 265, including the trial testimony of plaintiff and Fontanez concerning the accident, all depositions taken in the case, two visits to the accident site, an inspection of the LLV, photos taken of debris from the accident, Google Earth images, the weights of the vehicles, the width of the LLV, and the distance between the LLV headlight and the ground, *see* Tr. 106:20-107:2, 107:23-24, 109:1-3, 110:21-22, 111:10-12, 114:14-15, 118:13, 126:19-20. Other courts have found similar evidence to provide an adequate basis for accident reconstruction testimony. *See Boykin v. Western Express, Inc.*, No. 12-CV-7428 (NSR) (JCM), 2015 WL 539423, at *6 (S.D.N.Y. Feb. 6, 2015) (collecting cases about accident reconstruction, biomechanics, and causation experts).

At most, plaintiff's attacks on the factual basis for Hermance's testimony go to its weight, not its admissibility. *See Hollman v. Taser Int'l Inc.*, 928 F. Supp. 2d 657, 670 (E.D.N.Y. 2013). Many of plaintiff's arguments misrepresent Hermance's testimony. For example, plaintiff argues that Hermance initially described Lynhurst as a hill and then later agreed that the street was "relatively flat." Pls.' Letter Mot. at 1. Contrary to plaintiff's view, on cross-examination, Hermance stuck to his position that the two-percent grade of the street rendered it "a little hill" or

13

"a minor downgrade." Tr. 120:6-11. Plaintiff also disputes Hermance's assumption that the plaintiff turned onto Bay Street from Lynhurst from "the middle of the road." Pl.'s Letter Mot. at 1; *see* Tr. 111:17-120:25. But Hermance's assumption was based on plaintiff's own testimony, his observations of traffic on Lynhurst, and his personal experience driving plaintiff's route. *See* Tr. 111:10-20, 145:12-19. Plaintiff also argues that Hermance did not know the velocity of the vehicles, their angle of impact, or their weights. Pl.'s Letter Mot. at 1-2. Hermance used figures for the LLV's weight obtained from the Internet and the postal service. Tr. 133:17-19. He conceded possible variations in the LLV's weight but explained that his calculations yielded a range of possible velocities, not a precise figure, *see* Tr. 140:3-10. Although Hermance admitted that he did not know the angle of impact, he clarified that his analysis produced a reasonable range of velocities consistent with the evidence he examined. *See* Tr. 143:1-9. Given that Hermance provided a basis for his estimates, *see, e.g.*, *Robertson-Armstrong v. Robinson Helicopter Co.*, No. 13-2810, 2015 WL 7307168, at *4 (E.D. Pa. Nov. 19, 2015), Hermance's opinion is not "so fundamentally unsupported that it can offer no assistance" to the factfinder, *Hollman.*, 928 F. Supp. 2d at 670 (E.D.N.Y. 2013).

Hermance's testimony is also the product of reliable methods that Hermance applied reliably to the facts. *Amorgianos*, 303 F.3d at 265. Hermance calculated how long debris would have taken to fall to the ground after the collision and the change in the velocity of the colliding vehicles necessary to move the LLV over the curb. Tr. 110:7-19, 126:18-24, 130:6-139:4. He also gave a scientific explanation for the absence of skid marks at the scene. Tr. 155:21-156:16. Plaintiff's general and conclusory assertion that "Hermance's testimony is nothing more than a net opinion devoid of any basis in science" is therefore incorrect. Pl.'s Letter Mot. at 2. And to the extent that some of Hermance's testimony rests on his personal knowledge instead of hard

14

science, an expert may "tie observations to conclusions through the use of . . . general truths derived from . . . specialized experience." *Kumho Tire*, 526 U.S. at 148 (internal quotation marks and citation omitted). Since Hermance applied scientific and technical accident reconstruction methods to assumptions that were not "unrealistic and contradictory," his testimony is not "speculative or conjectural" such that it should be excluded. *Zerega*, 571 F.3d at 214.

Finally, I conclude that Hermance's testimony is relevant to the task of determining liability for the car accident. His scientific analysis of the debris location and the force needed to move the LLV makes Fontanez's account of the facts more probable than plaintiff's. *See* Fed. R. Evid. 401(a).

However, Hermance's speculation that the LLV was legally parked is inadmissible. *See* Tr. 155:8-13. An expert "may opine on an issue of fact within the jury's province" but "may not give testimony stating ultimate legal conclusions based on those facts." *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991); *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468 (S.D.N.Y. 2005). Hermance's conclusions about the LLV's parking spot are excluded. *See* Tr. 155:8-13.

II. **Liability**

The FTCA permits personal injury claims against the United States for the negligence of a government employee acting within the scope of his employment. 28 U.S.C. § 1346(b)(1); *see Liranzo v. United States*, 690 F.3d 78, 84-85 (2d Cir. 2012).

Under the FTCA, courts look to "state law to determine whether the government is liable for the torts of its employees." *Liranzo*, 690 F.3d at 86. Because the car accident in this case happened in New York, New York tort law governs plaintiff's negligence claim. *Avlonitis v.*

*United States*, No. 16-CV-2521 (PKC) (SMG), 2020 WL 1227164, at *5 (E.D.N.Y. Mar. 13, 2020).

To prevail on a negligence claim under New York law, a plaintiff must establish by a preponderance of the evidence three elements: "(i) a duty owed to the plaintiff by the defendant; (ii) breach of that duty; and (iii) injury substantially caused by that breach." *Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 215 (2d Cir. 2002); *see, e.g.*, *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 428 (2d Cir. 2013); *Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 177 (2d Cir. 2013); *Polanco v. United States*, No. 19-CV-1409 (LJL), 2020 WL 6504554, at *12 (S.D.N.Y. Nov. 5, 2020) (plaintiff's burden of proof is a preponderance of the evidence standard).

"New York law impose[s] a duty upon drivers to operate their vehicles with reasonable care taking into account the actual and potential dangers existing from weather, road, traffic and other conditions." *Goldstein v. United States*, 9 F. Supp. 2d 175, 186 (E.D.N.Y. 1998). That duty includes the driver's responsibility to "see that which through proper use of his . . . senses he . . . should have seen." *Allison v. Rite Aid Corp.*, 812 F. Supp. 2d 565, 570 (S.D.N.Y. 2011) (citation omitted). It follows from those principles that in New York, a rear-end collision between a moving vehicle and a parked vehicle generally establishes a prima-facie case of negligence against the driver of the moving vehicle and imposes a duty of explanation on that driver. *See Covey v. Simonton*, 481 F. Supp. 2d 224, 231-32 (E.D.N.Y. 2007) (collecting cases); *Krynski v. Chase*, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009) (collecting cases); *DeAngelis v. Kirschner*, 171 A.D.2d 593, 594 (N.Y. App. Div. 1991) ("[A]bsent some excuse, it is negligence as a matter of law if a stopped car is hit in the rear." (citation omitted)).

Nevertheless, the driver of an illegally parked car is sometimes liable when another driver hits the parked car. That is because in New York, a "violation of a [s]tate statute that imposes a specific duty constitutes negligence per se." *Elliott v. City of New York*, 95 N.Y.2d 730, 734 (N.Y. 2001). But to establish liability in such a case, the plaintiff must "prove[] that the negligence was the cause of the event which produced the harm." *Wallace v. Terrell*, 295 A.D.2d 840, 841 (N.Y. App. Div. 2002) (citation omitted). Accordingly, "[o]wners of illegally parked vehicles who create an unreasonable risk of harm to others must respond in damages to a party whose injury is proximately caused by the illegal conduct." *Sullivan v. Locastro*, 178 A.D.2d 523, 525 (N.Y. App. Div. 1991). But the fact that a vehicle is illegally parked "does not automatically establish that" the act of parking the car in an unlawful spot "was the proximate cause of . . . the injury." *DeAngelis*, 171 A.D.2d at 595.

Applying these principles, the government is not liable for the collision between plaintiff's car and the LLV. As I found above, plaintiff turned right on Bay and hit the parked LLV. If the LLV was legally parked, plaintiff has not provided a "non-negligent explanation" for that collision. *Covey*, 481 F. Supp. 2d at 232. And even assuming that the LLV were parked illegally in an unmarked crosswalk, as plaintiff suggests, *see* N.Y. Veh. & Traf. L. §§ 110(a) (defining crosswalk), 1202(a)(1)(d) (prohibiting parking in a crosswalk), plaintiff has not established that the illegal parking was a proximate cause of the accident, *see Locastro*, 178 A.D.2d at 525; *Terrell*, 295 A.D.2d at 841. Plaintiff testified that she saw the LLV parked on Bay before she turned, and that the LLV blocked her view of the intersection along with the bread truck. Tr. 56:13-57:13, 74:2-77:10. But she did not testify that she altered the trajectory of her turn onto Bay because of the LLV. *See ibid.* At most, plaintiff's suggestion that she

17

needed to look for "traffic . . . coming . . . right of me" indicates that her position *before* she turned was caused in part by the LLV. Tr. 75:19.

And even if plaintiff had altered her turn because of the LLV's position, the LLV's parking spot would still not constitute the proximate cause of the accident. "Assuming . . . that the defendant's truck was illegally parked at the time of the accident, the proximate cause of the accident was the plaintiff's failure to control her vehicle and to see that which, under the facts and circumstances, she should have seen by the proper use of her senses"—namely, the LLV. *Marsella v. Sound Distrib. Corp.*, 248 A.D.2d 683, 684 (N.Y. App. Div. 1998); *see Gerrity v. Muthana*, 28 A.D.3d 1063, 1064 (N.Y. App. Div. 2006) (finding summary judgment for defendant appropriate where location of illegally parked bus "merely furnished the condition or occasion for the occurrence of the event and was not one of its causes" (internal quotation marks and citation omitted)), *aff'd by* 857 N.E.2d 527 (N.Y. 2006). In short, plaintiff saw the parked LLV and nonetheless hit it. That sequence of events renders plaintiff liable under New York law. Since plaintiff has not carried her burden to show that defendant's parking spot proximately caused the accident, defendant is not liable.

## CONCLUSION

The government is not liable for the car accident. The Clerk of the Court is respectfully directed to enter judgment for the defendant and close the case.

SO ORDERED.

*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: September 30, 2020
      Brooklyn, New York